All right, I'll give everybody a minute to get to the tables. All right, case number 21-11258 and case number 22-11019, Gonzalez v. Duane et al., and we'll hear from Mr. Taylor. Mr. Taylor, on behalf of the plaintiff's appellants, may it please the court. Although the defendants, the appellees, do not like the term, this is a case about euthanasia. It's a case about passive euthanasia as used in Texas law. In addition, the arguments raised by the defendants have broadened the implications of this case to where the resolution of these issues may affect thousands and thousands of people. Let me ask you an easy question. Is there any reason we shouldn't consolidate these two cases fully and not just for oral argument? At this point, no. I think the reason we ask – it was my decision to ask for it to be consolidated for oral argument only because the briefing had been completed on the first one but not the second one. At this point, I don't – off the top of my head, I can't think of a problem consolidating at this point. Go ahead. It would be impossible for me to address all of these issues in the 15 minutes allotted. Instead, to the extent the court would like a preamble, I'll simply run through the issues and explain how they relate together and then field any questions you have. It might be helpful if you start with – and this may be on your list of issues – but what are the substantive obligations imposed on the defendants under state law? You kind of referenced it when you started talking. Tell us what the substantive obligations were on the defendants. The substantive obligations, I think, are determined primarily by the TADA, which is the issue – the first issue in the – what is the second appeal, 21-11-258. Under that, we went through a lengthy discussion in the briefing explaining there are mandatory provisions, use of must, shall, throughout this. And in Section 166.040, 050, for instance, it has specific must and shall that you may not terminate life support without following these procedures. The primary set of procedures is then 166.046, which provides that you can do it by agreement or you have to go through the process that ultimately is reached by a committee of whoever. The only other option for that, I think, is in 045 that says if a physician refuses to follow that procedure, they have to provide reasonable notice, opportunity to get alternate care. That's never been an issue in the briefing because they don't contend that they – it's never been an issue on that one. But that's essentially it. The best synopsis, though, actually may be in the notice provision, 166.052, which is the notice that's supposed to be provided. And it makes very clear that this whole thing is triggered by a treatment decision, and the decision isn't the agreement between the physician and the patient surrogate. It's a request by the patient surrogate. So once a request is made, the procedures have to be followed under state law. And then the issue, then, that leads into – if I answered that sufficiently. Well, let me ask you this, too, along the same lines. Is the state statutory scheme that you just described the exclusive governing authority or, in this case, alternatively, was there any sort of claim that there was an agreement? In other words, like a misrepresentation claim or a detrimental reliance claim that the patient surrogate, in this case the parents, had come to an agreement for this seven-day period, as I understand the allegations, that was breached. Is there a possible claim and was one asserted, or is it entirely governed by this statute? To be honest with you, I don't recall, Your Honor. I know there were originally a number of state law claims that were raised that were dismissed under the Texas Tort Claims Act because this was treated for the purposes as a government defendant. And I honestly – they've never been a part of the appeal at all. I don't remember what was alleged on that. In terms of the constitutional challenge, it has been based on straightforward deprivation of life, liberty, and property interest. With life being inherent in the Constitution, then confirmed by Kruzan in the end-of-life context, Kruzan also recognizing the liberty interest, even more so, to make end-of-life choices, as well as a limited property interest therefrom. Then we also raised state law as a separate basis for life and liberty interest under principles of VITEC, et cetera. With the parties agreeing – essentially agreeing to use the Childress standard from another circuit to determine whether it created a life or liberty interest protected by the Constitution. In terms of whether there were other claims that could have been made, I honestly don't recall whether they were under state law and they've never been briefed in terms of whether they raise constitutional implications, except to the extent they relate to one of these other constitutional claims. Did that answer your question? Yes. Okay. So then the first issue is whether the TADA, as I've said, creates a life and liberty interest separate from those inherent in the Constitution. I think that was pretty thoroughly briefed, and unless you have questions, I won't spend additional time addressing that, except to point out that that applies to all three of the defendants. So that's the one issue that applies to all three of them, and so if there's a reversal on that, it would require a reversal and remand to address the constitutional claims under that, regardless of any other issues. And I will say, in addition, it's clear that the Court erred on that one. I think the defendant appellees even agree on that in terms of his reasoning, that he provided me sua sponte, inserted his own analysis, and the parties agree that instead it should be under the children's analysis. The next question of the second appeal, 21-11258, is the issue of municipal ---- This is actually ---- we were up here once before, so I've been referring to them as the second and third. Oh, second and third. We came up two years ago. We have one and two. You have two and three. I have two and three. So if you prefer one and two, I'll refer to them as one and two. No, it's fine. Whatever. The next issue is the question of municipal and corporate liability of JPS and a claim, with JPS being the county and a claim being the ---- Because we could affirm that without affirming the Duane, the Dr. Duane findings, right? I mean, those two are not fully connected. They're partially connected, obviously. I think it depends. Let's break it down. Let's look just at the inherent in the Constitution claims, those under the 14th Amendment itself and Kruzan. If you find that you reverse against Dr. Duane but decide there's not municipal and corporate liability on those claims, then, yes, you could split them. I would say, however, if you determine that there is a separate constitutional right under the TADA, that the analysis may be different, and it may be that all three of those need to be remanded to address that further because that's never been addressed, and you may theoretically, I suppose, could reach a different policy custom decision depending on what your basis for constitutional claims. So I'm not ---- Let me go back. It's complicated. Let me take you back to the policy. You just mentioned the policy interest. Two questions. What is the institutional policy that you're arguing exists here, number one? And number two, does the firing of Dr. Duane in this case have any commentary regarding any such policy? Do you think that's relevant at all to the establishment of that policy or disclaimer of the policy? Addressing, first of all, it is necessary that there is some policy or custom adopted by JPS in a claim in order for this to occur. The doctor could not have acted alone. In this case, she acted by issuing an order, which was then carried out by multiple other people. This was an exercise of authority of the hospitals themselves, and so someone at some point, a policymaker, had to provide a policy or custom, had to either have created it or at least had constructive knowledge. Doctors give directives all the time to nurses and so forth, and that doesn't mean they're giving a directive that their hospital gave them. They said, give her drug X, and that turned out to be a disaster and she died from drug X. That wouldn't necessarily have been the policy of the hospital to give drug X. That was the doctor's decision. Certainly not. The issue in this case is that the policy is a policy of allowing doctors to make a unilateral decision. That is what offends Cruzan. That is what offends the TADA. That is what offends procedural due process. So, for instance, compare it. What that is, the generic notion that doctors are in charge as opposed to nurses or the janitor, how is that necessarily adopting, oh, and if you want to give them euthanasia, go for it, the specifics of this case as opposed to just generally when you go to a hospital, the doctor is going to be in charge. That's not a shocking concept. But does that mean that everything the doctor does is now attributable to the hospital? No. I think this is a particular area that is the subject of constitutional concerns as well as the state statute. And under the principles of Rhine, R-H-Y-N-E, maybe I'm mispronouncing, if there is a substantial risk that the absence of a policy is going to create a constitutional deprivation, you have to have a policy. So if they ignored it, then the ignoring of the TAD, of the CRUZAN, of the 14th Amendment requirements to prevent this, if they ignored it, that itself would constitute a policy or custom that would create. So do hospitals have to find every statute that might cover their hospital and have a policy on that statute or else they're ignoring the law? If it has constitutional implications, then they certainly do. I think that's absolutely right. If you have a constitutional directive not to deprive someone of life, if the Supreme Court recognizes this is a right in the end-of-life context, is if there is a specific statute with multiple musts and shalls that says you can't do X unless I think the policies are required under both state law to provide these policies but also because of the constitutional implications to have a policy under Rhine. And one of the two things occurred. Either they ignored it or they actually had a policy. In this case, I think we can tell from the arguments to this court that they did have a policy, and their policy was to say that the TADA, the only lawful measures allowed for withdrawing life support under state law were optional, that they were merely a safe harbor provision, and their physicians did not have to abide by them because that's what their counsel has told this court. Now, counsel's statements could not create a policy. We've never suggested that they can. But when a spokesperson speaks on behalf of an entity, it is expected that the spokesperson represents the actual policies of that entity, and that's particularly important in the context of the law when a duty of candor as well as the ethical rules and the rules of appellate procedure, civil procedure, require that the arguments be consistent with the positions of their clients. So I think based on the arguments of this court, it indicates that most likely that is the policy, that they treated this as an optional procedure and gave authority to their doctors to make these decisions. There is also another basis, however, for finding – When you did the discovery with Dr. Duane, was there any evidence of that? It never reached – there was never discovery on that because the court – Not on that specifically because I know they were dismissed, but you did do discovery with Duane, and that brought out a lot of information. Did it bring out anything on this? I couldn't speak to anything that isn't in the record. I'm only appellate counsel and not privy to any discovery other than what appears in the record of this case. But I do know that the court – There was actually only four months of discovery in this case because the court shut down all discovery, even to the municipal corporate parties, when the qualified immunity argument was made over the objection of counsel. And when that occurred, I think at that point there was no discovery or very limited discovery, at least, regarding these particular issues. As to whether anything popped up ancillary from Dr. Duane, I can't say. It hasn't been put in the record because it's not relevant to any of the issues that were – not relevant to the motion for summary judgment. But there is another basis for municipal corporate liability, which is Dr. Duane herself being a policymaker or vice principal, policymaker for JPS, vice principal for a claim as a private entity. And I would strongly request that the court evaluate that very closely because this is an area where snowballing dicta – I have to say, I think this is the first time I've heard vice principal since I was a state district judge. Maybe I'm sure that's not true, but it doesn't come up. And I don't think I've seen it come up in these 1983 scenarios. To the best of my knowledge, it's the first time it's been raised in any court in the country. Okay. And yet I think it is necessary corollary of the decision in Jett, et cetera, that says we look to state law to determine who are the policymakers, who are the – Oh, that's a cubby for, like, punitive damages and stuff like that. I just was surprised to see it in this context. Now, I'm not saying that you can't make a first-time argument and prevail on it. That's what good lawyers try to do. But it struck me as kind of an unrelated matter because that's not what that is about in Texas. I've only got six seconds left. Can I go ahead and finish that answer? Please. Okay. I would say that it is. You're absolutely correct that it was created in a punitive damages context. That's what everybody thinks about it, but that's not the case under Texas law. It's a principle of general corporate law. We cited a case in there which has slipped out of my head. I think it's GE or GTE, excuse me, a more recent Texas Supreme Court decision within the 2000s that applied it as a matter of general corporate law. It was in the insurance context, and it used vice principle to determine constructive knowledge. You may remember in the policymaker argument, constructive knowledge is one of the basis for applying a policy to an entity, by the way. But it used the vice principles outside of the punitive damage context, treated as a general principle of corporate law, and its significance is this. Different from respondeat superior, it does not just make an entity liable for its servant or employees. It treats the acts of the vice principle as the act of the entity itself, and that is exactly the issue that must be decided in Monell. So what has happened is since, is it Roseboro, the court has basically said you have to have Monell liability for private corporations acting under state law. We suggest that this is the standard, and if there are no other questions on other issues, I will sit down. Thank you. Thank you. And so we'll now hear from Mr. Vickers on behalf of Dr. Duane. Thank you, Your Honor. May it please the Court. Philip Vickers for Acclaimed Physician Group in the first appeal and for Dr. Duane in the second appeal. And I'd like to mention that both appeals raise complex issues. The Court's already touched on them, but we believe that an affirmance of the district court's summary judgment order, and actually there are three independent factual no evidence portions that we believe affirming on any one of them would alleviate the need to touch on any of these other complex issues because they would prove that there's no underlying constitutional violation. And so the three I'd like to touch on, we didn't hear much just now from plaintiff's counsel on the summary judgment, but this is critical. The first is that the complaint alleged that there was a withdrawal of life support without notice. There was no evidence produced, no competent evidence of that. In fact, the evidence showed that was not what happened. That totally removes the case from Cruzon, makes it a totally different case altogether. The second issue, there was no evidence of causation, which is necessary under this Court's opinion in Slade when plaintiffs are bringing claims under Section 1988 as wrongful death or survival claims, not on their own behalf, but on the behalf of someone else. This Court's precedent is very clear that there must be a proof of causation. There's no even attempt to prove that in this case. And then the third is on the qualified immunity. Again, because the facts show that this was an exercise of this physician's regular discretion, there had to be some proof that it was so beyond the standard of care, as a substantial departure from the standard of care, that no reasonable person, physician in the same circumstances, would make the same decision. And yet there was zero evidence of the standard of care in this case. But how does this all affect the dismissal? Because obviously that was before the summary judgment. That's right. That's right. And I should have said Mr. Blaze is here on behalf of the hospital district. Our plan had been for him to address that question. That's right. I will just say that we think it moots it, that if there's no underlying constitutional violation, the facts show that there was none. There's no evidence to prove it, and therefore there would be no basis for entity liability. That's the general idea. So what did the plaintiff's complaint allege? They allege that Plaintiff's son was admitted to the hospital with severe non-recoverable injuries with little hope of recovery. They then allege that Dr. Duane intentionally ordered that the removal of this ventilator occur in order to hasten the death of Plaintiff's son, and what they have described today as passive euthanasia. Let me ask you before we go further into what the allegations are. Is it your contention that the provisions of state law, which we've already talked about here this morning, were followed in the termination decision, the treatment decision? It's a great question, and the reason why it matters is because this is not a case about someone intending to withdraw life support. Cruzon, the Cook Children's case, those are both cases where everyone understood that what was happening was withdrawing life support. But what the evidence proved, this was Dr. Duane's testimony and the testimony of an expert who interpreted the medical records. It showed that Dr. Duane and the other providers believed that at the time the Plaintiff's son met what's called extubation criteria. Let me ask it in as blunt a terms, because you're much more familiar with the process than I am in terms of the doctor's actions in this case. Were the provisions of the TADA followed? Is that your position? Is that the doctor followed the provisions? There was no violation of state law? Or is it that even if there was a violation of state law, in this case Plaintiff doesn't prevail because of either issue A, B, or C? No, it's because this wasn't a withdrawal of life support. Removing the extubation, when someone doesn't need it... You're saying the statute doesn't govern at all. That's right. The Advanced Directives Act only governs when someone is intentionally saying, I'm ready to remove this person from life support, from treatment that is sustaining their life. But because the evidence shows, and was unrebutted, that the Plaintiff's son met the medical criteria for extubation, that is, there are certain criteria... What about all of the other facts before that with regard to meeting the family and there with the minister and the seven days and you're going to have this time? So I understand what you're arguing, but what about all of that that didn't give Dr. Duane notice that they were operating under the TADA? Well, I think what you have is a misunderstanding from what the medical physicians are thinking and what the plaintiff's family was thinking. They were thinking the oxygen is keeping him alive. But medically, that is not what Dr. Duane and other medical professionals at the time in the record said. They said, no, he now has a proper gag reflex, this RBSI, rapid shallow breathing index, I might have the acronym backwards, all are evidence that he's actually capable of breathing on his own, and when that happens, it's now a decision to remove not a life-sustaining treatment, but to remove an unnecessary treatment. And then I guess the issue then becomes, why didn't they then, whenever he started struggling, then re-intimate? Well, the only evidence is that there was a DNR, do not resuscitate order, that the plaintiff's family had put in. In fact, both plaintiffs, Mr. and Mrs. DePause, testified that when asked, did you give the DNR, they said, well, we might have, they couldn't remember. And they didn't deny that there was a DNR. And again, that becomes an exercise of medical discretion. Do doctors operating in this circumstance, is this a negligence claim? Perhaps plaintiffs might have had a negligence claim outside of the 1983 context, perhaps. But constitutional violations aren't based on negligence, it's disagreements about the standard of care. So to go back to the Advanced Directives Act and Cruzon, both kind of a 14th Amendment claim, and this kind of claim about process required from the Advanced Directives Act, without evidence that this was actually withdrawal of life support. Those cases don't matter, and it moves the case to a totally different frame. What about the argument that the DNR was withdrawn when they had that talk with the chapel and the notion that, well, we want the seven days, we think there is a miracle happening because he's starting to move. Does that withdraw the DNR? There's no evidence that Dr. Duane knew about this alleged seven days. There's no evidence of that in the record other than what the plaintiffs alleged. I said chapel, I meant chaplain. And there's no evidence that there's ever a promise for seven days. There's no evidence that the hospital would do that. That's not a standard. We don't know where that came from, and there's been no proof on it. The fact that the morning of Dr. Duane, plaintiffs' Mr. DuPaz actually testified that when Dr. Duane saw him that morning, she said, we are going to remove the tube, the breathing tube. We're going to extubate. He will be the same after as he was before. That's in plaintiff's testimony. That means she was saying he will be capable of breathing on his own. That's at 1177 through 79. So in that circumstance, when she's not removing life support, a DNR doesn't really come up in that particular context. That's what she understood if anything that there was an objection to was removing a tube. But a doctor who says I'm providing a treatment that's unnecessary. Yeah, but what about when he started? I was following up on Judge Saldana's question about how come you didn't reintubate, how come your client didn't reintubate once he started losing his breathing, and you said DNR. So that's what I was asking. Right. The DNR was in the record already. I believe the doctor had already given the order to extubate and to follow the DNR. Right. But why don't these chaplain discussions that followed with the claim that the doctors knew that we wanted the seven days and all of that, why doesn't that contradict the notion of, well, there's a DNR, so we can't? Well, there's no evidence to tie that to Dr. Duane in particular. But the second summary judgment ground I want to touch on, since I'm running low on my time before putting Mr. Blase, which I think will alleviate the court's even need to consider this, is Slade. The Slade case is one, Slade v. City of Marshall, I believe, where the court held that plaintiffs can only recover for a family member's constitutional injuries resulting in death if they can show that their son's death was more likely than not caused by the official's conduct, and not just that it reduced the chance of survival. So if a plaintiff is suing for their own rights, they have a right to say, you know, this was a violation, I have a claim. But because the plaintiffs here are only suing under the wrongful death statute, so this court's prior opinion in this case, the first, the 2021 opinion, held that the plaintiff standing here is based not on their own rights but on the rights they're seeking under the Texas wrongful death statute. Under that statute, Slade makes clear that the plaintiffs have to prove this causation to recover in that standing. So there is zero evidence offered to suggest that if, for example, going back to your question, there had been a reintubation, that the plaintiff's son would have survived in the long term. All the evidence is that when the plaintiff's son appeared at the hospital, he had suffered this brain injury in an accident. At least two neurosurgeons assessed his injuries to be non-survivable. The medical examiner determined the cause of death was that injury to the head. Now, the plaintiffs have suggested that there's justification for disregarding Slade, but the arguments you may hear, Slade considered them and disregarded them, said the purposes of 1983 are adequately protected by honoring this causation requirement for this type of claim. If the court has any other questions, frankly, mine is probably the more important part, so I'm not hearing more. Thank you. Thank you. We'll now hear from Mr. Blaise for Tarrant County Hospital. Thank you, Your Honor. May it please the court, my name is Grant Blaise and I represent the Tarrant County Hospital District, and we could spend all day talking about these issues, so there's very limited time to get to these issues. To follow up on your point, Judge Haynes, as far as how does the underlying merits of the claim and the disposition of those on summary judgment affect the appeal on the 12B6 motion, and there has been a the allegations in this case that were the subject of the 12B6 turned out not to be the factual events that occurred that gave rise to ultimately a disposition on the merits, and so under this court's case law in Kruger v. Garden District in NLRB, the court has held that if penning an appeal, an event occurs which renders it impossible for an appellate court to grant relief or renders a decision unnecessary, the appeal will be dismissed as moot. Now this was not actually part of the briefing, Your Honor, so if the court would like maybe some supplementary briefing following oral argument on that issue, we'd be happy to do that. But the bottom line is what you have now is essentially a moot appeal that deals with a 12B6 motion where there's been an underlying disposition on the merits in favor of the defendants. It's under this court's holding, numerous holdings, but under a State of Pollard, when you're talking about a Section 1983 claim, if there is an ultimate finding that there's been no constitutional violation by the defendant, then a Monell claim does not exist as a matter of law because there's a causal disconnect between any unconstitutional policy and any constitutional violation. So when you have a situation where there's been no underlying constitutional violation, you do not have Monell liability because there's been no unconstitutional policy or custom that was the moving force behind any unconstitutional act. So this court can address and dispose of the appeal on the 12B6 motion if it affirms the summary judgment in favor of Dr. DeWayne without further reaching any of the issues that were raised. You're saying that covers everything, including what she received the dismissal on? Yes, Your Honor, I do, because if the court is to uphold the summary judgment, affirm the summary judgment, the holding of the court was there was no constitutional violation. If there was no constitutional violation, there is no Section 1983 claim that you can tie to municipal liability under Monell because there wasn't a constitutional violation. In other words, the underlying case was this is an extubation case. This was not an advanced directive acts case. What occurred, even if you were to say, wow, that shouldn't have been done, it involves medical decision-making and not constitutional deprivation. And because of that, you don't have ultimate Monell liability because in order for you to get to even the Tarrant County Hospital District or a claim, you have to have some institutional policy or custom that was enacted that's unconstitutional that drove Dr. DeWayne's action. Let me ask you this. What if we were to reverse the summary judgment on DeWayne? Then what happens to your client? We believe that the court can affirm on two grounds. First of all, it can avoid the clearly difficult constitutional question by just addressing the fact that there is not a Monell claim here. There is not. They fail to properly allege the existence of unconstitutional policy or custom. Again, that was enacted. I mean, basically you either had a policy or you didn't. Either way, it's Monell. How do you respond to that? Well, I would respond where that alternative argument actually disposes of their argument because you've got to pick a policy. The case law says what is the policy? Articulate the policy in your pleading. They didn't do that. And the reason they didn't articulate the policy in their pleading is because they're like, hey, Dr. DeWayne did something bad. Well, it must have been because of a policy. It was either a policy that required her to do this or allowed her to do it or it was a policy that or it was the failure of a policy, failure to enact a policy to prevent her from doing it. Well, you can't have it either way, but there's no factual allegation that would support either the existence of a policy or the lack of a policy. And under Ryan, the lack of a policy, it's not a situation where something happened and, oh, my gosh, you should have had some policy to address it. The failure of a policy is incredibly difficult to prove and plead, plead and prove, and it must be a situation where it was the product of an intentional choice by the governmental entity not to have the policy. So, I mean, if there were years and years of people dying from having extubation and there was no policy, that's where you say it might come into play. Yes, Your Honor. Not this situation that was sort of coveyed in a month or so of Dr. DeWayne. Yes, Your Honor. Even assuming arguendo, she did all these bad things. Yes, Your Honor. Under this court's holding in Bennett, they're not alleging that there was an official policy or custom. Basically what they're alleging is there's a persistent widespread practice that essentially amounts to a policy or custom. But the burden of pleading and proving that is incredible, and it must be persistent, widespread, and constant. But in 12b-6, it just has to be pled properly. Right, and there's nothing here. What the factual allegations in the complaint address are the actions of a singular physician that, by their own pleadings, when it was brought to the attention of the powers that be at the hospital district, they took appropriate action. So if they're taking appropriate action based upon the conduct committed or the conduct that they allege was inappropriate and the hospital district is taking disciplinary action relative to those actions, that would dispose of the fact that there was a policy or custom that was enacted or not enacted by the county that would allow for this conduct to occur. It was obviously against county policy under the pleadings because, again, the facts of this case do not match the allegations. But if you take the allegations as true, what you have is she engaged in conduct that was inappropriate, the county once brought to the county's attention, the county disciplined her. Well, that would dispose of any argument that this was done with the acquiescence of the county, which dovetails into my next point about the policymaker and the unique vice principal. I was just about to ask, what about vice principal? It's just kind of interesting to be back in that world that I lived in as a state district judge and as a Texas lawyer. Yes, Your Honor, and I will tell you, to take a little bit of the baggage from her claim, the vice principal argument is vis-à-vis Dr. Duane and the claim. Dr. Duane was not an employee of the hospital district. She was an employee of a claim. But anyway, this is not corporate law. This is constitutional law. We're talking about sovereign immunity principles. We're talking about Section 1983. We're talking about Monell, which the Supreme Court has made clear there is no such thing as respondeat superior. There must be an institutional action by a policymaker. But the vice principal, even if that was – I mean, he deferred to you on 12B-6, so that's why I'm asking. Yes. But the vice principal, you're saying, cannot support a Monell claim, even if she was an employee of JPS. Correct, Your Honor, and here's why. There's a – I mean, the courts are clear that there must be a policymaker, an official policymaker, and that's a matter of state. That's governed by state law. It's not a decision-maker. She may have been a medical director and had administrative responsibilities relative to the provision of medical care, but there's a huge distinction between a final decision-maker and a policymaker, and I believe it's in my briefing. But whether or not you are a policymaker is, again, one of state law. For example, in a county jail, the sheriff is the policymaker of the county jail as a matter of law. In this particular case, the policymaker for the Tarrant County Hospital District is the board of managers of the hospital district, and that is based upon the health chapter – I can't remember the chapter off the top of my head, but it's in the Health and Safety Code. So the policymaker that has to have had, quote-unquote, knowledge or acquiesced in this policy is the board of managers of the hospital district, not Dr. DeWayne. They're trying to establish under, I believe, Pembower that since she was the policymaker and she's the one that engaged in that action, then you can impute corporate liability or institutional liability. I'm using inappropriate words there. But then again, that would require her to be a policymaker, and the courts are clear, the case law is clear, that the policymaker, for purposes of addressing Section 1983 liability, you look at that under Texas law, and under Texas law, that's the board of managers. This notion of being vice principal, it's essentially a dressed-up version of, hey, let's have respondent superior sneak back into Section 1983 liability. There's obviously no authority for the proposition that a vice principal can be equated with a policymaker under Section 1983, and I think for good reason. They're separate concepts. We're not talking about the corporate world. We're talking about the government. I believe that's all of my time. Your time has expired, so we'll now hear the rebuttal. Very quickly, starting with the MSJ, first of all, there is evidence to support the allegations of intent. Working in reverse order, the DNR was revoked, and there's evidence that it was revoked and known to Dr. Duane that it was revoked as the father was begging and crying not to pull the ventilator on the morning when she did it. If there was ever a DNR in place before then, it was gone by the morning before she pulled the ventilator out. Two, even if a DNR was in place, it would not have prevented reintubation. A DNR applies when you go into cardiac arrest. I think the evidence in this case shows that he did not go into cardiac arrest for something like 10 minutes. Instead, he had reduced oxygen hypoxia. Mr. MSJ, what evidence do you have that reintubation would have saved his life? I have the evidence that he was breathing fine on it for four days. As soon as the ventilator went off, it reduced by— So that reintubation would have saved his life, not that it would make him breathe another day or two. There is evidence that he met reintubation parameters cited in there. My question is, you all didn't have expert testimony, right? No. Okay, so is there any evidence that he would have survived, not just lived another day or two, but lived? I don't think there is. There is evidence that he would have been breathing on the ventilator because the ventilator would have put the oxygen supply just like it did before. Okay, wrongful death has to show causation of death, not just, wow, he could have been in a coma for another day or two. This isn't wrongful death in the traditional sense. This is deprivation of life and liberty, and if you look at, for instance, Judge Scalia's— But their standing is for wrongful death. No, it's for violation of the life and liberty interest. Liberty doesn't depend on death at all. You don't need death at all. It is the choice itself, just like the right to a jury trial in Hicks v. Oklahoma. It is the usurpation of that process, and the law is very clear in this court that a violation of procedural due process does not even require actual damages. It can have nominal damages and then exemplary damages to remedy the right. This is a survival action of the estate, so this is just their damages, and their damages are his death. They can sue under deprivation of life and liberty, but their claim is for the death, and you have no evidence that his death was caused by her conduct, right? I don't think that's right. I think that the rights of this are to remedy the rights of both the father as the bystander and of the underlying violations. I think that's what the court already decided in the first appeal. I think that we're entitled to sue on— But they dismissed the estate claim, right, the son's estate claim. I would have to go back and look. I think the estate was— I would maintain it as heirs, and I would have to go back and look at the record, which I would not have time for on the rebuttal. So that portion of it, though, we would say, aside from the issue she just raised, the order was for both extubation and non-reintubation in advance. There's no medical basis for that order. It's an indication that a jury could find intent, an intent to end his life, which is supported by orders two days before when she already made the decision not to code him before it had been discussed with the family, decided not to provide a feeding tube to allow a natural death two days before. There's evidence that the basis for her parameter that she relied on, the RSBI, was her basis that she had told another doctor that he had passed weaning parameters the day before when, in fact, that reading wasn't even taken until immediately before she passed death. There is evidence from which a jury could determine that she intended to kill him. And if you look at, say, for instance, the concurrence in Cruzan by Scalia, he clearly indicates that the arguments there are the same types they've made here, distinguishing between acts and omission. Omissions cause death as much as affirmative acts. As far as Slade, Slade is an opposite. The issue there is not whether there's a marvel multiverse, what would have happened if something happened different, but is there a causal connection? Here we have a causal connection that took ten minutes between pulling out a ventilator and his death. Regarding qualified immunity, I think we've addressed that adequately in the briefing. In terms of this being moot, whether it's moot is the question I raised earlier about the TADA. MSJ cannot move the TADA claims. If you think there's an independent right there, you would have to address it. I think I am read. And so I think if the Court has any other questions, I would be happy to address them. Otherwise, I will stop. Thank you very much. It doesn't look like it. Thank you for your arguments, all of you all. We appreciate your arguments. The case is now under submission. And we're going to take a